**Francine CLAUSSEN, Plaintiff,**

**v.**

**Shirley CHATER, Commissioner of Social Security, Defendant.**

**Civil Action No. 95–5214 (AJL).**

United States District Court,
D. New Jersey.

Oct. 29, 1996.

Anna P. Navatta, Bergen County Legal Services, Hackensack, NJ, for Plaintiff.

Faith S. Hochberg, United States Attorney, Peter G. O'Malley, SAUSA, United States Department of Justice, Newark, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action brought under sections 205(g) and 1631(c)(3) of the Social Security Act[1] (the "Act"), as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3), to appeal the final determination of the Commissioner of Social Security (the "Commissioner") denying the application of plaintiff Francine Claussen ("Claussen") for disability insurance benefits and supplemental security income benefits.[2] Jurisdiction is alleged pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, the instant matter is remanded to the Commissioner for further findings.

*Procedural History*

On 18 February 1993, Claussen submitted an application (the "Application") for disability insurance benefits and supplemental security income benefits under the Social Security Act, alleging disability, since 23 December 1992, due to multiple sclerosis. Tr. at 74–78. The Commissioner initially denied the Application on 27 April 1993, *id.* at 63–67, and subsequently denied Claussen's request for reconsideration on 5 August 1993, *id.* at 71–72.

On 13 September 1993, Claussen filed a request for review of the Application by an administrative law judge ("ALJ"). Tr. at 74. ALJ Quintin Morales–Ramirez ("ALJ Morales–Ramirez") held a hearing (the "Hearing") on 13 June 1994. *Id.* at 12. On 21 September 1994, ALJ Morales–Ramirez rendered his decision (the "Decision"), determining Claussen was not under a disability because, although Claussen "had a severe impairment," she retained the "residual functional capacity to perform the full range of sedentary work." *Id.* at 13, 19.

---

1. Act of 14 Aug. 1935, Pub.L. No. 271, ch. 531 (codified, as amended, at 42 U.S.C. §§ 301–1397f).

2. Claussen submitted: Brief in Support of Plaintiff Francine Claussen; Plaintiff's Reply Pursuant to General Rule 48B(3). The Commissioner submitted: Defendant's Brief Pursuant to General Rule 48. In addition, the Rule 48 Joint Document of Stipulated and Disputed Facts, and the Joint Medical Abstracts and the Transcript of the Administrative Record (the "Tr.") were considered.

On 15 November 1994, Claussen requested that the Appeals Council of the Social Security Administration's Office of Hearings and Appeals (the "Appeals Council") review the Decision. Tr. at 7. In a notice, dated 18 August 1995, the Appeals Council denied review. *Id.* at 4–5. Accordingly, the Decision became the final determination of the Commissioner. *Id.* at 4; *see* 20 C.F.R. §§ 404.981, 416.1481.

Claussen seeks judicial review of the Commissioner's determination. Claussen timely filed a complaint (the "Complaint") with the Clerk of the court, on 16 October 1995. *See* 42 U.S.C. § 405(g). Thereafter, the parties filed their submissions.

*Facts*

A. *Hearing Testimony*

1. *Testimony of Claussen*

Claussen, who was born on 11 November 1959, is unmarried and lives in an apartment with her young son in Elmwood Park, New Jersey. Tr. at 33, 51–52. Claussen testified her daily activities included making breakfast for her son, watching television and resting on her bed or couch. Tr. at 38–39. In addition, Claussen testified she occasionally drove to her doctors, the grocery store and the laundromat "when [she had] to." *Id.* at 34. While driving she testified she had difficulty with "double vision." *Id.*

Claussen testified a state-provided home health aide (the "Health Aide") assisted her by performing household tasks. Tr. at 38. The Health Aide also took care of Claussen's son: "She bathes him, she feeds him, she clothes him, she's the one that takes him outside. I don't have the energy to do it, so she does it." *Id.* at 39. Claussen testified that after the Health Aide leaves, her mother often assists her by cooking "or whatever." *Id.*

In a series of answers to questions from ALJ Morales–Ramirez, Claussen testified she is able to bend down, kneel down, reach up, reach down and pick up objects weighing five pounds. Tr. at 36. She confirmed she does not need assistance to feed or dress herself. *Id.* at 38. Claussen testified, however, when she walks she gets tired within a couple of blocks and her "legs start to cramp." *Id.* at 35–36. She further testified she can only sit for about fifteen minutes at a time because her "legs start stiffening up," *id.* at 36, and cannot stand for long without experiencing discomfort. *Id.*

Claussen testified she attended school up to the ninth grade. Tr. at 34. Thereafter, she worked as a waitress until the seventh month of her pregnancy in December 1992. *Id.* at 34–35. Claussen testified she is prevented from working because she is "too tired all the time." *Id.* at 35.

Claussen testified her multiple sclerosis caused "very bad" fatigue after about twenty to thirty minutes of activity. Tr. at 39–40. This fatigue caused her to get overtired, and, in turn: "My blurry vision gets worse, my mood swings are worse, my legs go—everything gets worse if I get too overtired or fatigued." *Id.* As a result, she spent about fifty to seventy-five percent of the day lying down. *Id.* at 40. Furthermore, Claussen testified her memory and concentration were deteriorating. *Id.*

Claussen testified she visits her doctor at the Bernard Gimbel Multiple Sclerosis Center (the "Gimbel Center") about "once a year" unless she has an exacerbation. Tr. at 35. Claussen testified her treatment included taking the prescription drugs Prozac and Laorso and her doctor had advised her "to get a little exercise." *Id.* at 35, 37.

B. *Medical Records Before ALJ Morales–Ramirez*

ALJ Morales–Ramirez examined several medical reports submitted by physicians who treated or examined Claussen. These included a medical record from Said Shanawani, M.D. ("Dr. Shanawani"), dated 5 April 1993 (the "Shanawani Report"), Tr. at 95–98, a record from the Gimbel Center, dated 22 April 1993 (the "Gimbel Report"), *id.* at 99, a medical record from Maryann Picone, M.D. ("Dr. Picone"), Claussen's neurologist, dated 11 June 1993 (the "First Picone Report"), *id.* at 100–102, a medical record from Dr. Picone, dated 15 June 1993 (the "Second Picone Report"), *id.* at 103, a medical record from Dr. Picone, dated 29 June 1993 (the "Third Picone Report"), *id.* at 104, a medical record

from Dr. Picone, dated 26 July 1993 (the "Fourth Picone Report"), *id.* at 105, progress notes from the Gimbel Center, dated March 1987 through November 1993 (the "Progress Notes"), *id.* at 109–129, a one page questionnaire, dated 9 June 1994, filled out by Dr. Picone for the Social Security Administration (the "Picone Evaluation"), *id.* at 143, an eight-page report, dated 22 April 1993, evaluating Claussen's physical limitations (the "Residual Physical Functional Capacity Assessment"), *id.* at 55–62, and a one page report from the Social Security Administration evaluating Claussen's employment capacity, dated 27 April 1993 (the "Social Security Notice"), *id.* at 67.

### 1. *The Shanawani Report*

The Shanawani Report indicates Dr. Shanawani first treated Claussen on 17 March 1987. *Tr.* at 97. Dr. Shanawani diagnosed Claussen with multiple sclerosis "characterized by slow and dyskinetic tongue motion." *Id.* In reaching his diagnosis, Dr. Shanawani noted Claussen exhibited a sudden onset of numbness in her face, arms and legs. *Id.* He also noted other instances of specific physical findings: on 17 March 1987, Claussen suffered from overwhelming fatigue, "sleeping in late" and blurry vision; on 15 September 1987, she exhibited pain in her extremities; on 11 March 1992, she had difficulty lifting her right foot; on 16 September 1992, she suffered numbness in both hands; and on 19 February 1993, ataxia [3] was noted. *Id.* Dr. Shanawani also reported a modified barium swallow exam, conducted on 9 February 1993, indicated a "mild oral stage dysfunction." *Id.*

### 2. *The Gimbel Report*

The Gimbel Report recorded information Claussen conveyed on her 16 April 1993 visit to the Gimbel Center. *Tr.* at 99. The Gimbel Report indicated Claussen suffered numbness in her arms, had ataxia and intermittently used a cane, but that she had no problems with her hands. *Id.*

### 3. *The First Picone Report*

The First Picone Report records Claussen's condition as of 11 June 1993. *Tr.* at 102. It indicated Claussen was losing her balance, feeling "dizzy," having "blurry vision," undergoing "mood swings," experiencing weakness in her left wrist and was becoming forgetful. *Id.*

### 4. *The Second Picone Report*

The Second Picone Report is a report of a phone conversation between Dr. Picone and Claussen on 18 June 1993. *Tr.* at 103. Dr. Picone reported: "[Claussen's] condition is basically the same—she was seen yesterday having another exacerbation" and the "same symptoms [were] flaring up." *Tr.* at 103.

### 5. *The Third Picone Report*

The Third Picone Report is a one-page report to the Division of Disability Determinations. *Tr.* at 104. Dr. Picone reported Claussen's condition, as of 29 June 1993, was essentially the same as reported in a Second Picone Report. *Id.* Dr. Picone observed Claussen continues to have "flare-ups." *Id.*

### 6. *The Fourth Picone Report*

The Fourth Picone Report is a one-page medical report describing Claussen's condition as of 26 July 1996. *Tr.* at 105. Dr. Picone noted: "downgoing toes", reflexes "2 + /4" and "difficulty with tandem" in Claussen's gait. *Id.* Additionally, Dr. Picone noted: "MS Exacerbation not responding to steroids orally." *Id.*

### 7. *The Progress Notes*

The Progress Notes are twenty-one pages of notes from the Gimbel Center, dated March 1987 through November 1993. *Tr.* at 109–29. Because Claussen alleges disability starting 23 December 1992, the Progress Notes during this period are the ones most relevant. The Progress Notes prior to this period, however, serve as a basis for comparison. For example, a Progress Note, dated 16 September 1992, a time when Claussen was working full time as a waitress and was

---

**3.** Ataxia is an abnormal condition characterized by impaired ability to coordinate movement.

*Mosby's Medical, Nursing, and Allied Health Dictionary* 139 (4th ed. 1994).

four months pregnant, records occasional dizziness and pain in addition to numbness in her arms. *Id.* at 122. There was no mention of fatigue and under the section "Incapacity Status," Claussen received a score of "0," indicating no problem. *Id.*

In a Progress Note, dated 19 February 1993, Dr. Picone reported Claussen was "unable to work" and had an incapacity score for fatigue of "2–3," indicating "extreme fatigue." Tr. at 123. The Progress Note also indicated Claussen suffered from numbness and aching in both legs, and she occasionally tripped on her own feet. *Id.*

In a Progress Note, dated 16 April 1993, "extreme fatigue" was again indicated, and Claussen's incapacity score for fatigue increased to "3–4." Tr. at 124. The Progress Note reported Claussen had difficulty with her balance, experienced numbness and suffered from aches, blurry vision and clumsiness. *Id.*

A Progress Note, dated 21 May 1993, reported Claussen suffered from "extreme fatigue," with her incapacity score for fatigue increasing further to "4." Tr. at 126. The Progress Note also indicated Claussen exhibited the following: "loses balance," increasingly trips, blurry vision with "fluttering eyes," numbness in her hands and legs, and "dizzy constantly." *Id.* In addition, the Progress Note indicated Claussen occasionally suffered from choking and stuttering, and became increasingly forgetful. *Id.*

### 8. *Picone Evaluation*

The Picone Evaluation is a one page questionnaire regarding Claussen's condition prepared for the Social Security Administration. Tr. at 143. The Picone Evaluation reported Claussen's positive MRI for multiple sclerosis. *Id.* The Picone Evaluation further indicated Claussen's "great deal of fatigue" was a functional limitation that interfered with her ability to hold a job and concluded Claussen

was not capable of working five days a week, full time, at a sedentary position. *Id.* The Picone Evaluation, however, reported Claussen's prognosis to be "Good." *Id.*

### 9. *Residual Functional Capacity Assessment*

The Residual Functional Capacity Assessment is an eight-page report from the Social Security Administration evaluating Claussen's physical limitations. Tr. at 55–62. It reported that, as of 22 April 1993, Claussen was able to: lift objects weighing up to ten pounds occasionally;[4] lift objects weighing less than ten pounds frequently;[5] stand/walk for a total of at least two hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday. *Id.* at 56.

Postural limitations were identified: Claussen was able to climb, balance, stoop, kneel, crouch or crawl only occasionally. Tr. at 57. No manipulative, visual, communicative or environmental limitations, however, were identified. *Id.* at 57–60.

### 10. *Social Security Notice*

A one page report evaluating Claussen's employment capacity, dated 27 April 1993, is contained in the five-page Social Security Notice. The report concludes: "Claimant can no longer perform her job as a waitress. She can do sedentary work." *Id.*

### *Discussion*

### A. *Standard of Review*

A review of a final decision of the Commissioner is made pursuant to 42 U.S.C. § 405(g).[6] *See Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir.1995). Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. If supported by substantial evidence, the Commissioner's factual findings of disability must be accepted as

---

4. "Occasionally means occurring from very little up to one-third of an 8–hour workday (cumulative, not continuous)." Tr. at 55.

5. "Frequently means occurring one-third to two-thirds of an 8–hour workday (cumulative, not continuous)." Tr. at 55.

6. Section 405(g) provides in pertinent part:

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action....

42 U.S.C. § 405(g).

conclusive. *Ventura,* 55 F.3d at 901; *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993); *Woody v. Secretary of HHS,* 859 F.2d 1156, 1159 (3d Cir.1988). Substantial evidence has been defined as " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.' " *Ventura,* 55 F.3d at 901 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW,* 714 F.2d 287, 290 (3d Cir.1983).

Reasonable minds can reach different conclusions following review of the evidentiary record upon which the Commissioner's decision is based. Nevertheless, in such cases, a district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala,* 40 F.3d 43, 46 (3d Cir.1994) (citing *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427). A court may not displace an administrative body's " 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*' " *NLRB v. Greensburg Coca–Cola Bottling Co.,* 40 F.3d 669, 672–73 (3d Cir.1994) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)).

Nonetheless, an ALJ is expected to do more than simply state factual conclusions. *See Stewart,* 714 F.2d at 290. Rather, the ALJ must make specific findings of fact to support his or her ultimate findings. *Id.* The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected. *See Wier on Behalf of Wier v. Heckler,* 734 F.2d 955, 961 (3d Cir.1984); *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981). He or she must also give serious consideration to the claimant's subjective complaints of pain, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala,* 994 F.2d 1058, 1067–68 (3d Cir.1993); *Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir. 1986).

■ An ALJ, however, is not obliged to accept without question the credibility of such subjective evidence. *See Marcus v. Califano,* 615 F.2d 23, 27 (2nd Cir.1979). An ALJ has discretion " 'to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.' " *LaCorte v. Bowen,* 678 F.Supp. 80, 83 (D.N.J. 1988) (quoting *Brown v. Schweiker,* 562 F.Supp. 284, 287 (E.D.Pa.1983)). If an ALJ concludes testimony is not credible, however, the basis for such a conclusion must be indicated in his or her decision. *See Cotter,* 642 F.2d at 705.

### B. *The Five–Step Sequential Evaluation*

■ Title II [7] of the Act provides for the payment of benefits to persons who suffer from disabilities who have made contributions to the disability insurance program. *See* 42 U.S.C. § 423(a)(1)(D). Title XVI of the Act, Supplemental Security Income for the Aged, Blind and Disabled [8] ("SSI"), provides for the payment of benefits to indigent persons who are disabled. *See* 42 U.S.C. § 1381a.[9]

Both Titles II and XVI provide for the payment of benefits when a claimant establishes his or her inability

to engage in any substantial gainful activity by reason of any medically determinable

---

**7.** Act of 14 Aug. 1935, Pub.L. No. 271, ch. 531, §§ 201–33 (codified as amended at 42 U.S.C. §§ 401–33).

**8.** Social Security Amendments of 1972, Pub.L. No. 92–603, §§ 1601–34, 86 Stat. 1465–93 (codified as amended at 42 U.S.C. §§ 1381–83d).

**9.** Because the standards for eligibility under Title II and judicial review thereof are virtually identical to the standards under Title XVI, decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. § 1381a. *Sullivan v. Zebley,* 493 U.S. 521, 525 n. 3, 110 S.Ct. 885, 888–89 n. 3, 107 L.Ed.2d 967 (1990).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act further provides that an individual

shall be determined to be under a disability only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy....

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In accordance with the authority granted under 42 U.S.C. § 405(a), as incorporated by reference in 42 U.S.C. § 1383(d)(1), the Commissioner has promulgated regulations (the "Regulations") to give effect to and further define the provisions of the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The Regulations provide for a five-step sequential evaluation of an individual's claim for disability insurance benefits and supplemental security income benefits. *See Sullivan*, 493 U.S. at 525, 110 S.Ct. at 888–89; *Williams*, 970 F.2d at 1180.

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a), 416.920(a).

Substantial gainful activity is work that is both substantial and gainful.... Substantial work activity is work activity that involves doing significant physical or mental activities. [An applicant's] work may be substantial even if it is done on a part-time basis or if [the applicant] do[es] less, get[s] paid less, or ha[s] less responsibility than when [the applicant] worked before.... Gainful work activity is work activity that [the applicant] do[es] for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572. If a claimant is found to be engaged in substantial gainful activity, the claim of disability will be denied, regard-

less of medical condition. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987) (citing 20 C.F.R. § 404.1520(b)).

If the claimant is not engaged in substantial gainful activity, the analysis of the claim proceeds to step two. Step two, commonly known as the "severity regulation," involves a minimum threshold determination whether the claimant is suffering from a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(b). An impairment is considered severe if it is "of a magnitude sufficient to limit significantly the individual's 'physical or mental ability to do basic work activities.'" *Santise v. Schweiker*, 676 F.2d 925, 927 (3d Cir. 1982) (quoting 20 C.F.R. § 404.1520(c)), *cert. dismissed*, 461 U.S. 911, 103 S.Ct. 1889, 77 L.Ed.2d 280 (1983). Evidence of a "physical or mental impairment" must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner may require." 42 U.S.C. § 423(d)(5)(A). The ability to do basic work activities is defined as

"the abilities and aptitudes necessary to do most jobs." Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Yuckert*, 482 U.S. at 141, 107 S.Ct. at 2291 (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). An ALJ need only consider medical evidence in step two, without regard to vocational factors such as the claimant's age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).

In step two of the analysis, the claimant must make the threshold showing that his or her impairments are sufficiently severe to satisfy this standard. *See Yuckert*, 482 U.S.

at 146 n. 5, 107 S.Ct. at 2293–94 n. 5. If a claimant fails to make this showing, he or she is ineligible for disability insurance benefits or supplemental security income benefits. *See id.* at 148, 107 S.Ct. at 2294–95; *Santise,* 676 F.2d at 927.

If the claimant is not engaged in substantial gainful activity and has a severe impairment, the evaluation proceeds to step three. Step three requires a determination of "whether the impairment is equivalent to one of a number of listed impairments [ (the "Listed Impairments") ] that the Commissioner acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. "If the impairment meets or equals ... [a] [L]isted [I]mpairment[ ], the claimant is conclusively presumed to be disabled." *Id.; see also* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If a claimant does not suffer from a Listed Impairment or its equivalent, the analysis proceeds to steps four and five. Under these steps, "the Commissioner must determine whether the claimant retains the ability to perform either his [or her] former work or some less demanding employment." *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983).

Step four requires an ALJ to consider whether the claimant retains the residual functional capacity to perform work he or she performed in the past. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is defined as what the claimant "can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). An ALJ must evaluate the physical and mental requirements of the claimant's past work in determining the claimant's residual functional capacity. *See Velazquez v. Heckler,* 802 F.2d 680, 682 (3rd Cir.1986); 20 C.F.R. §§ 404.1520(e), 416.920(e). "At step four, vocational factors [such as age, education and work experience] are not considered in determining whether or not a claimant retains the residual functional capacity to perform past relevant work." *Williams,* 970 F.2d at 1187; *see* 20 C.F.R. § 404.1560(b). If the claimant is able to meet the demands of his or her past work, then he or she is not disabled within the meaning of the Act. *See Yuckert,*

482 U.S. at 141, 107 S.Ct. at 2291; *Adorno,* 40 F.3d at 46. At step four, as with the previous steps, the claimant bears the burden of proof. *See Yuckert,* 482 U.S. at 146 n. 5, 107 S.Ct. at 2293–94 n. 5; *Adorno,* 40 F.3d at 46.

If a claimant demonstrates an inability to resume his or her former occupation, the evaluation moves to step five. At this final stage, the burden of proof shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. *See Yuckert,* 482 U.S. at 146 n. 5, 107 S.Ct. at 2293–94 n. 5; *Adorno,* 40 F.3d at 46. Further, an ALJ's determination of disability at step five must be based on the claimant's age, education, work experience and residual functional capacity. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ must also analyze the cumulative effect of all of a claimant's impairments. *See* 20 C.F.R. § 404.1545.

### C. *ALJ Morales–Ramirez's Findings*

At step one of the five-step sequential analysis, ALJ Morales–Ramirez observed there was no evidence to refute Claussen's allegation she has not worked since 23 December 1992. Tr. at 13. Accordingly, ALJ Morales–Ramirez determined Claussen had not engaged in substantial gainful employment since 23 December 1992 and that she met the disability insured status requirements from that date through 31 December 1997. *Id.* at 18.

At step two, ALJ Morales–Ramirez determined Claussen had a severe medical impairment resulting from multiple sclerosis: "Said Shanawani, M.D., explained that this disorder was characterized by slow and dyskinetic tongue motion, and the records of Maryanne (sic) Picone, M.D., document [Claussen's] complaints of weakness in her legs and loss of balance, with findings upon examination of reduced motor strength in the legs." Tr. at 13 (citations omitted).

At step three, however, ALJ Morales–Ramirez determined Claussen did not have an impairment or combination of impairments that meet or equal the level of the Listed

Impairments because multiple sclerosis "requires specific findings which are not present." Tr. at 13.

At step four, ALJ Morales–Ramirez found Claussen's impairment prevents her from performing "her past relevant work as a waitress." Tr. at 14. ALJ Morales–Ramirez determined "with findings of reduced motor strength in the legs as reported by Dr. Picone, it is reasonable to conclude that the claimant is unable to stand and walk for the entire workday, and ... that the claimant can no longer perform her past relevant work." *Id.* Accordingly, the analysis shifted to step five.

At step five, ALJ Morales–Ramirez acknowledged the Commissioner had the burden to show there are other jobs existing in significant numbers in the national economy which Claussen can perform, consistent with her medically determinable impairments, age, functional limitations, education and work experience. Tr. at 14.

ALJ Morales–Ramirez observed, at the time of the hearing, Claussen was thirty-four years of age and she was, therefore, a "younger person" under the Regulations. Tr. at 19 (citing 20 C.F.R. §§ 404.1563, 416.963). He further observed Claussen had only a ninth-grade education. *Id.* ALJ Morales–Ramirez concluded Claussen: "has retained the residual functional capacity to perform a full range of sedentary work activity." *Id.* at 13.

ALJ Morales–Ramirez further found: "Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rules 201.25, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4 [ (the "Grids") ], *direct* a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, she is not disabled." Tr. at 19 (emphasis added). Consequently, ALJ Morales–Ramirez held: "The claimant is therefore not disabled for the purpose of entitlement to disability insurance benefits and supplemental security income." *Id.* at 13.

In reaching his conclusion, ALJ Morales–Ramirez considered the medical reports submitted by Dr. Picone and acknowledged Dr. Picone's opinion, provided it is well supported by substantial medical evidence, was controlling because she was Claussen's treating neurologist. Tr. at 14. He, nevertheless, did not credit Dr. Picone's conclusion Claussen cannot perform light or sedentary work activity because he found it was "not well supported by objective medical findings." *Id.*

ALJ Morales–Ramirez also considered Claussen's testimony regarding her symptoms and limitations. Tr. at 15. He dismissed this testimony: Claussen's "allegations as to her exertional capabilities are credible, but her allegations of debilitating fatigue, blurred vision, reduced concentration and memory, and other symptoms are not fully credible, as they are contradicted by various factors." Tr. at 18.

### D. *Analysis*

The instant matter must be remanded to the Commissioner for three reasons: (1) the rejection of Dr. Picone's conclusion that Claussen is disabled does not appear to be supported by substantial evidence; (2) the rejection of Claussen's testimony regarding her overwhelming fatigue likewise does not appear to be supported by substantial evidence; and (3) ALJ Morales–Ramirez improperly applied the Grids to determine Claussen is not disabled.

#### 1. *Rejection of Dr. Picone's Conclusion*

■ Dr. Picone's conclusion that Claussen is unable to perform sedentary work was rejected because "Dr. Picone did not set forth objective findings upon examination to support her conclusion the claimant cannot perform sedentary or light work activity." Tr. at 14. Essentially, Dr. Picone's determination was found too conclusory to support a finding of disability.

■ Where an ALJ finds a physician's report conclusory or unclear it is incumbent upon the ALJ to secure additional evidence from another physician. *Ferguson v. Schweiker*, 765 F.2d 31, 36–37 n. 4 (3d Cir. 1985); *see Director, OWCP, U.S. Dep't of Labor v. Mangifest*, 826 F.2d 1318, 1329 n. 19 (3d Cir.1987); *Cintron v. Bowen*, 686 F.Supp.

522, 524 (E.D.Pa.1988); *Veal v. Heckler*, 610 F.Supp. 1094, 1096 (E.D.Pa.1985).

ALJ Morales–Ramirez emphasized: "The positive MRI test and positive BAER test confirmed the diagnosis of multiple sclerosis but do nothing to establish the degree of the claimant's neurological impairment, which must be done using clinical findings, which Dr. Picone did not set forth." Tr. at 14. Accordingly, additional evidence regarding the degree of Claussen's neurological impairment should have been sought.

■ Furthermore, the reasons for the rejection of Dr. Picone's evidence were not sufficiently addressed. "While the ALJ is, of course, not bound to accept physicians' conclusions, he [or she] may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." *Kent v. Schweiker*, 710 F.2d 110, 115 n. 5 (3rd Cir. 1983) (citing *Cotter*, 642 F.2d at 705–06).

In rejecting Dr. Picone's disability determination ALJ Morales–Ramirez observed: "Upon examination[, on 19 February 1993,] and subsequent examinations, the claimant had mild to moderate loss of motor strength in her legs, *although her gait was consistently normal.*" Tr. at 15 (emphasis added). Although ALJ Morales–Ramirez did observe that "on one occasion, Dr. Picone reported that the claimant had ataxia and used a cane intermittently," he did not address other evidence regarding Claussen's problems with her gait. *Id.*

The record indicates, on 19 February 1993, Claussen occasionally tripped on her feet. Tr. at 123. The record indicates that on 21 May 1993 her problem with tripping had increased. *Id.* at 126. Finally, on 26 July 1993, "difficulty with tandem" was noted in her gait. *Id.* at 105.

ALJ Morales–Ramirez relied, in part, on Claussen's "normal gait," in finding Claussen could perform sedentary work:

> [Claussen] has full motor strength in her arms, and with full motor strength in the upper extremities and mildly to moderately reduced motor strength in the lower extremities, *with a normal gait*, she is able to meet the exertional demands of sedentary work activity. Thus, Dr. Picone's conclusion that the claimant is unable to perform sedentary or light work is not well supported by objective medical evidence.

Tr. at 105 (emphasis added). ALJ Morales–Ramirez, however, did not explain his conclusion Claussen's gait was normal given the evidence regarding her problem with tripping and her "difficulty with tandem."

The rejection of the evidence of Claussen's fatigue was also not adequately addressed. The only medical evidence contrary to Dr. Picone's determination Claussen was not capable of performing sedentary work is the Residual Functional Capacity Assessment. Tr. at 55–62. The Residual Functional Capacity Assessment is not referred to in ALJ Morales–Ramirez's decision; moreover, if the report had been considered, it alone would not constitute substantial evidence.[10] *Mason*, 994 F.2d at 1065 (citing *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir.1986)); *Green v. Schweiker*, 749 F.2d 1066, 1071, n. 3 (3d Cir.1984) (citing *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir.1983)); *Kellam v. Bowen*, 663 F.Supp. 238, 241–42 (E.D.Pa. 1987).

*2. Rejection of Claussen's Testimony*

■ ALJ Morales–Ramirez rejected Claussen's complaints of fatigue: "The claimant's allegations as to her exertional limitations are largely credible, but her allegations of debilitating fatigue and other diffuse symptoms are not fully credible, as they are contradicted by various factors." *Tr.* at 17.

---

**10.** The Residual Functional Capacity Assessment is a form report where boxes are checked and blanks completed. Tr. at 55–62. Three of the five dates on which the examiner based his determination on occurred before the alleged date of onset of disability. *Id.* at 56–57. The Third Circuit has expressed skepticism for these kinds of reports:

> Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. As we pointed out in discussing "residual functional capacity reports," where these so-called "reports are unaccompanied by thorough written reports, their reliability is suspect...."

*Mason*, 994 F.2d at 1065.

As indicated, where medical evidence supports a claimant's complaints of pain, the complaints should be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Mason,* 994 F.2d at 1067–68 (citing *Carter v. Railroad Retirement Board,* 834 F.2d 62, 65 (3d Cir.1987)); *Ferguson,* 765 F.2d at 37. In the instant case, Claussen complained of "very bad" fatigue after about twenty to thirty minutes of activity. Tr. at 39–40. She stated this fatigue causes her to get overtired, and, in turn: "My blurry vision gets worse, my mood swings are worse, my legs go— everything gets worse if I get too overtired or fatigued." *Id.* Claussen's subjective complaints, moreover, are supported by both a positive MRI test and a positive BAER test for multiple sclerosis.[11] *Id.* at 143.

The Social Security Administration's guidelines indicate multiple sclerosis is a disease characterized by fatigue. 20 CFR Pt. 404, Subpt P, App 11.09 ("Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved in the multiple sclerosis process."). Claussen's testimony regarding her debilitating fatigue, therefore, appears to have been reasonably supported by the medical evidence. Accordingly, the complaints of fatigue can not be rejected without contrary medical evidence.

ALJ Morales–Ramirez further found: "The ability to sit for prolonged periods and perform fine manipulations is consistent with an ability to perform sedentary work activity." Tr. at 15. This finding was based, in part, on the misunderstanding that Claussen testified she can "sit for up to 50 minutes at one time." *Id.* An examination of the rec-

ord, however, indicates Claussen testified she can only sit for periods of up to fifteen minutes. *Id.* at 36. Given this misunderstanding, the conclusion Claussen is able to perform sedentary work is questionable.

In addition, ALJ Morales–Ramirez found the medical record "[s]uggests that the claimant [has] occasional periods of exacerbation of her symptoms but that she has not had a lasting episode of advanced symptoms." Tr. at 16. In support of this finding, the ALJ cites the frequency of Claussen's office visits, and his conclusion that an

examination of the medical record establishes that she has only occasional exacerbations during which she experiences some of these symptoms and that *she has not had progression of her symptoms* during which she was unable to perform the full range of sedentary work activity for a period less than, for at least 12 months.

*Id.* at 16–17 (emphasis added).

It appears ALJ Morales–Ramirez may have overlooked medical evidence supporting Claussen's claim. As indicated, Dr. Picone determined Claussen is not capable of performing sedentary work as a result of her "great deal of fatigue." Tr. at 143. As indicated, moreover, the Progress Notes reveal a progression in Claussen's fatigue level since the alleged date of onset of disability. *Id.* at 122–23, 125–26.[12]

### 3. *The Medical Vocational Guidelines*

Finally, it appears the Grids were improperly applied. ALJ Morales–Ramirez *directly* applied the Grids: "Section 404.1569 of Regulations No. 4 and section 416.969 of Regulation No. 16 and Rules 201.25, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, *direct* a conclusion that, considering the claimant's residual functional capacity,

---

11. The following are some of the classical symptoms of multiple sclerosis: ocular disturbances, double vision, difficulty with speech, difficulty with performing with the extremities, weakness in arms or hands such as inability to grip, ataxia (difficulty in walking characterized by stumbling, wobbling, falling), abnormal reflexes, and clonus (extreme weakness in the legs). *The Sloane–Dorland Annotated Medical–Legal Dictionary* 632 (1994).

12. ALJ Morales–Ramirez further observed: "Dr. Picone found that the claimant had a good prognosis even upon her most recent examination, suggesting that Dr. Picone does not find that the claimant will have extensive, ongoing symptomatology as the claimant testified to." Tr. at 17. An ALJ, however, may not make speculative inferences from medical reports. *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir.1981).

age, education, and work experience, she is not disabled." Tr. at 19. (emphasis added).

Directly applying the Grids to a claimant with nonexertional limitations is improper. *Gilliland v. Heckler,* 786 F.2d 178, 183–84 (3d Cir.1986); *Washington v. Heckler,* 756 F.2d 959, 967 (3d Cir.1985); *Green,* 749 F.2d at 1071–72; *Santise,* 676 F.2d at 934–35; *Mac v. Sullivan,* 811 F.Supp. 194, 198 (E.D.Pa.1993); *Burton v. Bowen,* 704 F.Supp. 599, 604–05 (E.D.Pa.1989); *Johnson v. Bowen,* 699 F.Supp. 475, 482 (E.D.Pa. 1988); *Atkins v. Bowen,* 690 F.Supp. 383, 389–90 (E.D.Pa.1988); *Singleton v. Schweiker,* 551 F.Supp. 715, 723–24 (E.D.Pa.1982).

ALJ Morales–Ramirez acknowledged Claussen's allegations of nonexertional limitations, including debilitating fatigue, blurred vision, reduced concentration and reduced memory. Tr. at 18. The Social Security Administration's guidelines specifically list difficulty in "maintaining attention or concentrating" and difficulty in seeing as examples of nonexertional limitations. 20 CFR § 404.1569a(c). When combined exertional and nonexertional limitations affect a claimant's employment capacity the Commissioner "will not *directly* apply the rules in appendix 2 unless there is a rule that directs a conclusion that [the claimant is] disabled based upon [his or her] strength limitations; otherwise the rules provide a framework to guide [the] decision." 20 CFR § 404.1569a(d) (emphasis added). Accordingly, ALJ Morales–Ramirez misapplied the Grids. *Green,* 749 F.2d at 1067, 1072 (remanding case because the "ALJ erred in dismissing [the claimant's] complaints of non-exertional blackouts and dizziness, and erred in applying the [G]rids where such non-exertional complaints were at issue . . . .").

*Conclusion*

For the reasons stated the instant matter is remanded to the Commissioner for further proceedings consistent with this opinion.